UNITED STATES DISTRICT COURT

For the Northern District of California

1
2
3
4
5
6
7

8                UNITED STATES DISTRICT COURT

9                Northern District of California

10                San Francisco Division

11   DOUGLAS DAVIS,                           No. C 13-03082 LB

12               Plaintiff,                   **ORDER DENYING DEFENDANT'S**
                                              **MOTION FOR SUMMARY**
13        v.                                  **JUDGMENT AND REMANDING FOR**
                                              **FURTHER PROCEEDINGS.**
14   CAROLYN W. COLVIN,
     Acting Commissioner of Social Security, **[Re: ECF No. 20]**
15
                 Defendant.
16   _____/

17                    **INTRODUCTION**

18       On July 3, 2013, Douglas Davis filed a complaint, pro se, against the acting Commissioner of

19   Social Security, Carolyn Colvin, seeking judicial review of the Commissioner's final decision

20   denying his claim for disability benefits for his claimed disabilities caused by broken ribs, collapsed

21   lungs, and back, knee, and hand pain.  Complaint, ECF No. 1.  The Administrative Law Judge

22   ("ALJ") found that Mr. Davis could not perform his past relevant work, but could perform other

23   work in the national economy available in significant numbers.  Administrative Record ("AR") 24-

24   31.  All parties have consented to the court's jurisdiction.  ECF Nos. 4, 11.  Pursuant to Civil Local

25   Rule 16-5, the matter is deemed submitted for decision by this court without oral argument.  *See*

26   ECF No. 19.  For the reasons stated below, the court **DENIES** the Commissioner's motion for

27   summary judgment, and **REMANDS** this case to the Social Security Administration for further

28   proceedings.

**STATEMENT**

**I. PROCEDURAL HISTORY**

Mr. Davis applied for disability and disability insurance benefits on January 12, 2010.  AR 160-61.  The Commissioner denied Mr. Davis's claims initially on June 10, 2010, and upon reconsideration on September 17, 2010.  AR 90-94, 96-100.  On October 6, 2010, Mr. Davis requested a hearing before an ALJ.  AR 102-03.  On June 9, 2011, Mr. Davis applied for supplemental social security income.  AR 24.  In both applications, he alleged his disability began on June 5, 2008.  *Id.*

ALJ Tim Stueve conducted a hearing on both applications on August 18, 2011 in Oakland, California.  AR 37-87.  Mr. Davis was represented by attorney Michael Paul, substituting for Avi Leibovic.  AR 39.  Mr. Davis and vocational expert Joel Greenberg (the "VE") testified.  *Id.*  On September 6, 2011, the ALJ issued his decision that Mr. Davis was not disabled under the Social Security Act.  AR 21-35.  On April 30, 2013, the Appeals Council denied Mr. Davis's request for review, rendering the ALJ's decision the final decision of the Commissioner.  AR 1-3.

On July 3, 2013, Mr. Davis filed the complaint in this action.  Complaint, ECF No. 1.  Because Mr. Davis did not move for summary judgment by November 12, 2013, in accordance with the court's Social Security Procedural Order, ECF No. 2, the court ordered him to show cause, in writing, why his action should not be dismissed for failure to prosecute.  *See* Order, ECF No. 17.  By letter dated February 4, 2014, Mr. Davis responded to the order to show cause, stating that the Commissioner's determination that he could lift 30 to 50 pounds was wrong.  *See* ECF No. 18 at 1.  Mr. Davis also stated that Dr. Merritt Smith advised him that his injuries are permanent and he is totally disabled due to chronic arthritis and disc disease.  *Id.*

The court discharged the order to show cause, provided a copy of the court's Handbook for Litigants Without a Lawyer, and advised Mr. Davis how he could seek assistance from the Legal Help Center.  *See* ECF No. 19 at 2.  The court indicated that Mr. Davis could file a brief within 28 days to provide any additional reasons he is entitled to summary judgment in his favor.  *Id.*  Davis did not file anything further.  The Commissioner moved for summary judgment.  *See* Motion, ECF No. 20.  Mr. Davis did not file an opposition to the Commissioner's motion.

## II. SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS

This section summarizes the medical evidence in the administrative record from (A) Mr. Davis's treating physicians, (B) his non-treating physicians, (c) the hearing testimony, and (D) the ALJ's findings.

### A. Medical Evidence: Treating Physicians

#### 1. Alameda County Medical Center, Christine O'Dell, R.N. (October 14, 2008)

On October 14, 2008, Mr. Davis went to Alameda County Medical Center complaining of flank and lower back pain. AR 297. According to the notes of registered nurse Christine O'Dell, Mr. Davis described his pain as sharp and increasing with inspiration. *Id.*

#### 2. John Muir Medical Center (February 9 - March 4, 2009)

On February 9, 2009, Mr. Davis sustained significant injuries in a single vehicle accident on the freeway. AR 249. He was transported by ambulance to John Muir Medical Center where he was examined and treated by numerous doctors and medical staff, including Dr. Nicolas Skaric and Dr. Karin Cheung. AR 248-294. Examination by admitting physician Dr. Skaric and pulmonary intensivist Dr. Cheung revealed injuries including chest and abdominal trauma. AR 251, 253. A toxocology screen was positive for cocaine. AR 251. Mr. Davis was admitted into the Intensive Care Unit and intubated due to his respiratory condition. AR 250-53. Doctors performed multiple imaging tests in order to determine the extent of Mr. Davis's injuries. A CT Scan of Mr. Davis's chest revealed bilateral pulmonary contusions and tiny pneumothoraces. AR 250. Mr. Davis had multiple rib fractures, including ribs two through ten on his left side and his second rib on the right side. *Id.* A chest x-ray corroborated the multiple rib fractures and showed diffuse subcutaneous air and mediastinal emphysema. *Id.* Mr. Davis was discharged on March 4, 2009. AR 358. He was prescribed Norco for pain and a nicotine patch. AR 249.

#### 3. Alameda County Medical Center, Dr. Daniel Price (April 15, 2009)

On April 15, 2009, Mr. Davis visited Alameda County Medical Center for chest and upper body pain and a refill of his medication. AR 340-50. A physical examination showed clear lungs, normal pulse, no abdominal tenderness, clear speech, and normal gait. AR 340-41. A chest x-ray showed multiple left-sided rib fractures. AR 343. Dr. Price prescribed Vicodin for pain and referred Mr.

1   Davis to the General Medicine Clinic for follow-up care.  AR 340, 349.

2   **4. *West Oakland Health Council, Dr. Merritt Smith (September 1, 2009)***

3   On September 1, 2009, Mr. Davis sought treatment at West Oakland Health Council for pain and

4   his chest and left shoulder.  AR 302-12.  Upon examination, Dr. Merritt Smith reported nasal polyps

5   and congestion and  mild dysymmetry in the shape of his chest.  AR 305.  All other findings were

6   normal.  *Id.*  Dr. Smith prescribed Naprosyn and Vicodin, recommended he return in 8 weeks, and

7   referred him to Health Education for tobacco, cocaine, alcohol, and marijuana abuse.  AR 304, 316.

8   Dr. Smith's report of Mr. Davis's visit includes more details, but is largely illegible.

9   **5. *Dr. Tom Piatt (September 28, 2009)***

10   On September 28, 2009, radiologist Dr. Piatt issued a report on x-rays of Mr. Davis's chest,

11   cervical spine, and left shoulder.  AR 314.  Dr. Piatt found old rib fractures and upper lobe densities.

12   *Id.*  He recommended further evaluation with apical lordotic and oblique views to determine possible

13   infiltrates or masses.  *Id.*  The cervical spine x-ray revealed degenerative changings, including mild

14   narrowing of discs C4-C5 and C5-C6.  *Id.*  The image of Mr. Davis's left shoulder showed an old

15   AC separation and calcification anterior to the distal clavicle, and it confirmed a left rib fracture.  *Id.*

16   **6. *Dr. Merritt Smith (November 10, 2009)***

17   Mr. Davis next saw Dr. Smith on November 10, 2009.  In addition to Naprosyn and Vicodin, Dr.

18   Smith prescribed an eye drop called Lodex.  He indicated that Mr. Davis wanted to return to work.

19   AR 308-09.

20   **7. *Alameda County Medical Center, Dr. Eric Snoey (April 16, 2010)***

21   Mr. Davis visited Alameda County Medical Center on April 16, 2010 after he slipped and fell on

22   stairs in his wife's house.  AR 338.  Mr. Davis complained of mid-lower back pain that was

23   exacerbated by movement.  *Id.*  He described the pain as dull, aching, sharp, and throbbing and rated

24   it a 5 out of 10.  Dr. Snoey diagnosed Mr. Davis with back strain and prescribed Lorazepam and

25   Vicodin.  AR 338-39.  A chest x-ray showed multiple left-sided rib fractures and an increased

26   density in the apex of the lung likely to indicate a contusion.  AR 343.

27   **8. *Dr. Merritt Smith (April 20, 2010)***

28   Mr. Davis visited Dr. Smith again on April 20, 2010.  AR 414.  Mr. Davis complained of pain in

*(left margin, vertical text)* **UNITED STATES DISTRICT COURT** For the Northern District of California

his right hip and mid-lower back.  *Id.*  Dr. Smith prescribed Vicodin and Baclofen.  *Id.*  Dr. Smith

ordered x-rays of Mr. Davis's cervical spine, lumbar spine, and thoracic spine.  *Id.*  A follow-up visit

was scheduled for June 8, 2010.  *Id.*  Dr. Smith's treatment notes from this visit are otherwise

illegible.  *See* AR 414-15.

### 9. Dr. Tom Piatt (April 29, 2010)

On April 29, 2010, Dr. Piatt issued a report on several imaging tests including thoracic spine,

lumbar spine, left clavicle, bilateral hip, and chest x-rays.  AR 416.  The cervical spine x-ray

revealed multilevel degenerative changes, particularly in the C5-C6 disc and left upper lobe density.

*Id.*  Both the thoracic spine and lumbar spine x-rays showed mild multilevel disc degeneration.  AR

416-17.  The left clavicle x-ray revealed an old grade 3 AC separation and old left rib fractures.  AR

417.  Bilateral hip x-rays conducted showed mild degenerative arthritis of the right hip and public

symphysis.  *Id.*  Two chest x-rays revealed old rib fractures and degenerative changes, but no

evidence of cardiopulmonary trauma or pulmonary pathology.  AR 418.

### 10. Dr. Merritt Smith (June 8, 2010)

Mr. Davis saw Dr. Smith on June 8, 2010, but the doctor's records of this visit are extremely

difficult to discern. The notes reference x-rays, labs, Vicodin, Baclofen, and a follow-up visit

scheduled for July 27, 2010.  *Id.*

### 11. Dr. Merritt Smith (July 27, 2010)

On July 27, 2010, Dr. Smith noted that Mr. Davis had chronic back pain but was stable.  AR 412.

In addition to Vicodin and Baclofen, three other medications were apparently prescribed.  *Id.* A

follow-up visit was scheduled for October 19, 2010.  Dr. Smith's handwritten notes are otherwise

illegible.  *See id.*

### 12. Dr. Merritt Smith (August 8, 2010)

Dr. Smith completed the Physical Residual Functional Capacity Questionnaire on August 8,

2010.  Dr. Smith diagnosed Mr. Davis with severe degenerative joint disease in his cervical,

thoracic, and lumbar spine and indicated that his prognosis was fair and progressive.  *Id.*  Dr. Smith

observed that Mr. Davis experiences chronic back pain, arm and leg weakness, and numbness

bilaterally.  *Id.*  Dr. Smith noted that the pain is centered in Mr. Davis's cervical, thoracic, and

UNITED STATES DISTRICT COURT
For the Northern District of California

lumbar spine. *Id.*  Throughout his treatment, Dr. Smith utilized and recommended analgesics, muscle relaxants, physical therapy, and a TENS unit.  *Id.*  Dr. Smith found that Mr. Davis's impairments have lasted or are expected to last over 12 months.  AR 422.  Dr. Smith also noted that Mr. Davis suffered from depression which affects his physical condition.  *Id.*  Additionally, he mentioned that Mr. Davis's impairments are reasonably consistent with the symptoms and functional limitations described in his examination.  *Id.*

According to Dr. Smith, Mr. Davis's ability to perform simple tasks is not impaired by his inability to concentrate.  *Id.*  Nonetheless, he recommended that Mr. Davis perform "low stress" work due to the chronic pain that affects his mood and attention span.  *Id.*   If placed in a competitive work situation, Dr. Smith estimated Mr. Davis could not sit or stand more than 5 minutes at any one time. AR 422-23.  Dr. Smith opined that Mr. Davis could never lift or carry any weight in a competitive work situation and could never twist, stoop/bend, crouch, climb ladders, or climb stairs. AR 423.  He indicated that Mr. Davis's limitations in doing repetitive reaching, handling, or fingering was moderate to severe.  *Id.*  Concluding that Mr. Davis's limitations in combination were likely to produce good and bad days, Dr. Smith estimated that Mr. Davis would be absent from work more than 4 days per month.  AR 424.

### 13. Dr. Merritt Smith (December 7, 2010)

The records of Mr. Davis's appointment with Dr. Smith on December 7, 2010 refer to his chronic back pain and multiple level disc disease, and note other conditions that the court cannot read.  AR 410.  The next visit was scheduled for January 17, 2011, but the notes on the following page seem to indicate that Mr. Davis missed that appointment with the notation "n/s" for no-show and the word "cancelled."  AR 411.

### 14. Dr. Merritt Smith (March 24, 2011)

During his visit on March 24, 2011, Mr. Davis complained of a loss of mobility on his right side and depression, and he requested an MRI.  *Id.*  Dr. Smith diagnosed Mr. Davis with multiple-level disc disease, a mood disorder, and third condition that the court cannot discern.  He prescribed Ultram, Gabapentin, Vicodin, and Paxil.  AR 408.  The notes on the following page appear to state "consider neurology vs. neurosurgery."  AR 409.  Dr. Smith wanted to see Mr. Davis again in 2 to 4

weeks.

### 15.  Dr. Merritt Smith (June 28, 2011)

Mr. Davis visited Dr. Merritt Smith on June 28, 2011.  AR 407.  Mr. Davis complained of back pain and rated the pain 5 out of 10.  AR 407.  It appears Dr. Smith prescribed Ultram, Neurotin, Paxil, Vicodin, Baclofen, and possibly Viagra.  *Id.*  The next appointment was scheduled for August 9, 2011.

### B.  Medical Evidence: Non-Treating Physicians

#### 1.  Dr. Feng Bai (March 17, 2010)

On March 17, 2010, Dr. Feng Bai performed a complete orthopedic evaluation of Mr. Davis at the request of the Disability and Adult Programs Division of the Department of Social Services.  AR 317-23.  During his visit, Mr. Davis complained of left knee, neck, back, and left shoulder pain.  AR 318.  Dr. Bai noted that Mr. Davis described his pain as constant, sharp, throbbing, and burning pain at the knee, neck, back, and left shoulder.  *Id.*  Mr. Davis also expressed that sitting, standing, walking, bending, and lifting aggravated these symptoms.  *Id.*  At the time of Dr. Bai's examination, Mr. Davis was taking Vicodin and Naprosyn.  *Id.*

Dr. Bai's reported that Mr. Davis could sit, stand, walk, and change positions comfortably and without difficulty.  AR 319.  Dr. Bai also observed that Mr. Davis was able to walk with a normal gait without assistive device or footdrop, as well as tip-toe and heel walk without difficulty.  *Id.*  Although Mr. Davis brought a cane to the exam room, Dr. Bai observed that he ambulated better when he did not use it.  *Id.*  Dr. Bai indicated Mr. Davis had a normal range of motion in his neck, back, and upper and lower extremities.  AR 319-20.  Upon palpation, Mr. Davis had mild tenderness in his low back and left knee.  AR 320.  Mr. Davis also experienced minimal tenderness in his left shoulder and AC joint area.  *Id.*

Dr. Bai opined that Mr. Davis "is able to carry or lift 50 pounds occasionally and less than 25 pounds frequently."  AR 322.  He also concluded that Mr. Davis "is able to stand and walk six hours in an eight-hour day and able to sit for six hours of an eight-hour day."  *Id.*  In Dr. Bai's view, Mr. Davis had no pushing and pulling limitations other than carrying and lifting," had no postural or manipulative limitations, and did not need to use a cane.  *Id.*

**UNITED STATES DISTRICT COURT**
For the Northern District of California

### 2. *Dr. Elizabeth Whelchel (March 22, 2010)*

On March 21, 2010, Dr. Elizabeth Whelchel, a psychologist, performed a complete psychiatric evaluation of Mr. Davis at the request of the Department of Social Services. AR 325-332. Mr. Davis's chief complaint was "I have depression and I am emotionally unstable." AR 325. At time of examination, Mr. Davis was taking naproxen and hydrocodone and using psoriasis ointment. AR 326.

Dr. Whelchel found that Mr. Davis could dress and bathe himself but "seems to have some significant range of motion difficulties." AR 328. Mr. Davis's mood was depressed and he reported feelings of hopelessness and worthlessness. AR 329. During his visit, Mr. Davis identified psychosocial stressors to be money, an unstable living environment, chronic pain, and health concerns. AR 330. Dr. Whelchel diagnosed Mr. Davis with major depression that was moderate and recurrent, and a crack cocaine dependence that was in full, sustained remission. *Id.* Her prognosis was that "[f]rom a psychological standpoint, [Mr. Davis's] condition would be expected to improve in the next twelve months with active psychotherapy, medication management, and medical intervention to help him with his physical problems related to his car accident." AR 331.

After conducting a functional assessment, Dr. Whelchel observed that Mr. Davis was able to understand and carry out simple one or two step job instructions but was unable to follow detailed and complex instructions. *Id.* In addition, Mr. Davis was mildly impaired in his ability (1) to relate and interact with his co-workers and the public, (2) to associate with day-to-day work activity, including attendance, safety, and accepting instructions from supervisors, and (3) to maintain concentration, attention, persistence, and pace. *Id.* Mr. Davis also was moderately impaired in his ability to maintain regular attendance in the workplace and perform work activities on a consistent basis without special or additional supervision. *Id.*

### 3. *Dr. Bianchi* (March 30, 2010)

On March 30, 2010, Dr. Bianchi performed a Physical RFC Assessment. AR 353- 57. He concluded that Mr. Davis was able to occasionally "lift and/or carry 50 pounds" and frequently "lift and/or carry 25 pounds." AR 354. In addition, Dr. Bianchi opined that Mr. Davis could stand or walk for six hours in an eight-hour work day and could sit or walk for six hours in an eight-hour

1    work day.  *Id.*  Dr. Bianchi also noted that Mr. Davis could also push and pull without limitation.  *Id.*

2    Dr. Bianchi indicated that no postural, manipulative, visual, communicative, or environmental

3    limitations had been established.  AR 354-56.

4    ### *4. Bay View Medical Clinic, Dr. John Prosise (May 5, 2010)*

5        On May 5, 2010, Dr. John Prosise conducted a psychological evaluation in connection with a

6    disability determination service screening.  AR 333.  Dr. Prosise diagnosed Mr. Davis with a major

7    depressive disorder that is recurrent and mild and a cocaine dependence in reported remission.  AR

8    335.  Dr. Prosise concluded that Mr. Davis's "prospect of employment is limited by his physical

9    resources, following injuries he suffered in a 2009 motor vehicle accident, and it is complicated by

10   his longstanding, untreated depression (which eased, visibly, with contact and alliance)."  *Id.*

11   ### *5. Dr. Meenakshi (June 9, 2010)*

12       On June 9, 2010, Dr. Meenakshi rated the functional limitations caused by Mr. Davis's major

13   depressive disorder and cocaine dependence in full remission.  AR 361, 269.  Dr. Meenakshi

14   concluded that Mr. Davis's (1) restriction of activities of daily living and (2) difficulties in

15   maintaining social functioning were "mild," while his (3) difficulties in maintaining concentration,

16   persistence, or pace were "moderate."  AR 369.  Dr. Meenakshi found no repeated episodes of

17   decompensation of extended duration.  *Id.*

18       In performing a Mental Residual Functional Capacity Assessment, Dr. Meenakshi found that Mr.

19   Davis was moderately limited in his ability (1) to understand and remember detailed instructions, (2)

20   to carry out detailed instructions, and (3) to complete a normal workday and workweek without

21   interruptions from psychologically based symptoms and to perform at a consistent pace without an

22   unreasonable number and length of rest periods.  AR 372-73.  Mr. Davis was found "not

23   significantly limited" in all the other categories.  In conclusion, Dr. Meenakshi's Residual Capacity

24   Assessment was that Mr. Davis was limited to simple and repetitive tasks, and would experience

25   moderate problems in persistence and pace, mild problems socially, and mild problems with changes

26   in routine.  AR 374.

27   ### *6. Andres Kerns, Ph. D. (June 15, 2010)*

28       After reviewing the medical evidence of record, Dr. Kerns affirmed that Dr. Meenakshi's finding

1    that Mr. Davis was capable of unskilled work.  AR 375.

2        **C. Administrative Hearing**

3            ***1. Mr. Davis***

4    Mr. Davis testified before the ALJ on August 18, 2011.  AR 39.  Mr. Davis was last employed in

5    2008 by Just Water Heaters, Inc. as a water heater installer.  AR 45, 49.  Mr. Davis stated that he

6    was laid off due to problems with the economy.  AR 45.  He later attempted to work on his own as a

7    plumber but was not successful.  AR 46.

8    Between his lay-off in June 2008 and car accident in February 2009,  Mr. Davis had experienced

9    some depression but suffered no physical impairments.  AR 50.  As a result of the car accident, Mr.

10   Davis was hospitalized for about a month.  AR 51.  The injuries he sustained included multiple

11   contusions, broken ribs, collapsed lungs, and back problems.  *Id.*  Although Mr. Davis tested

12   positive for cocaine when he was hospitalized after the accident, he testified he had been sober since

13   then.  AR 51-52.

14   Mr. Davis testified that his physical limitations included arthritis in his neck, hands, legs, and

15   back.  AR 53.  He experienced the most pain in his back, neck, and shoulders, and rated this pain a

16   seven out of ten.  AR 54.  In addition, Mr. Davis's muscles sometimes twitched uncontrollably,

17   particularly his leg if he stood in a particular way.  AR 53.

18   As a result of falling on stairs and hitting his back in April 2010, his right side has felt like "it's

19   dying."  AR 53.  Since the fall he had also become numb from his elbows down and experienced

20   tingling sensations in both hands.  *Id.*  Although he had been healing from his car accident, the fall

21   exacerbated his injury.  AR 57.  He had carried a cane since the accident because he had trouble with

22   this balance, but did not usually lean on it.  AR 57-58.  Since the fall, however, he had increased his

23   reliance on the cane and could not do anything without it.  AR 58, 65.

24   Mr. Davis testified that he could stand for 30 minutes with his cane and walk a block with it

25   before he needed to rest or he tripped over his right foot, which dragged.  AR 58, 65.  He could sit

26   for an hour before he needed to move for circulation.  AR 58.  Mr. Davis estimated that he could lift

27   about seven or eight pounds, but found it difficult to use his arms because he was numb from his

28   elbows to his fingertips.  AR 60, 68.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

### 2. *Vocational Expert*

Vocational expert Joel Greenberg also testified at the hearing. AR 69-78. The ALJ asked the VE to describe Mr. Davis's past work. The plumber job (DOT #862.381-030) that Mr. Davis performed most recently had a Specific Vocational Preparation ("SVP") of 7 and heavy physical demands.[1] AR 70. While working as a plumber, Mr. Davis also performed warehouse work. *Id.* This would be best considered a "material handler" job (DOT 929.687-030) with an SVP of 3 and heavy physical demands. *Id.* Before that, Mr. Davis was a "machine operator II" (DOT 619.685-062), which is a semi-skilled position with an SVP of 3 and medium physical demands.[2] *Id.* Additionally, the "forklift operator" job (DOT 921.683-050) had an SVP of 3, although Mr. Davis had performed it at a medium level. AR 70. Finally, the position as a "truck driver, light" (DOT 906.683-022) was semi-skilled with an SVP of 3 and medium physical demands. AR 71.

The ALJ posed a hypothetical of "a person who is able to lift up to 50 pounds occasionally, lifting or carrying up to 25 pounds frequently, in medium work as defined by the regulations; with work lifted to simple, routine, repetitive tasks, involving only simple work-related decisions with few if any workplace changes." *Id.* The ALJ then asked the VE whether the hypothetical person would be able to perform Mr. Davis's previous work. *Id.* The VE testified that the "machine operator II" and "truck driver, light" jobs could be performed. *Id.*

The VE further testified that there were other jobs in the regional or national economy that a person of Mr. Davis's age, education, work experience, and RFC could perform. AR 72. These included a hand packager (DOT 920.587-018), which has an SVP of 2 and required a medium exertion level. *Id.* There were 676,000 such jobs nationally, 93,000 statewide, and 5,440 in the Oakland-Fremont metropolitan statistical area. *Id.* Another possible position would be that of a

---

[1] "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." Social Security Ruling 00-4p (SSR 00-4p).

[2] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567.

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   janitor (DOT 381.687-018), which has an SVP of 2 and medium physical demands. *Id.* Because

2   50% of janitorial jobs were likely to be a combination of light and heavy, the VE reduced the

3   number of jobs available to be 1 million nationally, 100,000 statewide, and 5,600 locally. *Id.*

4       The ALJ's second hypothetical concerned using a cane for prolonged ambulation and uneven

5   terrain. AR 73. Use of the cane would eliminate the job prospects for a machine operator because

6   such individuals are required to be on their feet. *Id.* While the janitor position involves leveled

7   surfaces, it also requires prolonged ambulation and would therefore be eliminated. *Id.* The hand

8   packager job would still be an option for an individual using a cane, given that the work typically

9   involves standing or sitting. *Id.*

10      The third hypothetical involved an individual who needed to use a cane at all times while

11   standing. The VE testified that past work could not be completed with that level of cane usage. AR

12   74. Additionally, the hand packager job would be reduced by 80 percent, leaving 20 percent of hand

13   packager jobs that would allow Mr. Davis to sit. AR 74, 76.

14      According to the VE, Dr. Smith's medical source opinion, which indicated that Mr. Davis "can

15   never lift, twist, stoop, crouch, or climb; that he can only sit for 5 minutes at a time; and would miss

16   more than 4 days," would preclude all work. AR 75.

17      Mr. Davis's attorney posed the final hypothetical, which asked what jobs were available to a

18   person the same age, education, and background of Mr. Davis who needed to use a cane when

19   standing or walking. AR 76. When asked about a hypothetical person who could not sit or stand for

20   more than four hours, would need a cane when walking, and could only carry 7 to 8 pounds, the VE

21   testified that these requirements would rule out all jobs in the national economy. AR 77.

22      **D. The ALJ's Findings**

23      Applying the sequential evaluative process as discussed below, the ALJ held on September 6,

24   2011, that Mr. Davis was not disabled under §§ 216(i) and 223(d) and therefore not entitled to

25   disability insurance benefits. The ALJ also held that Mr. Davis was also not disabled under §

26   1614(a)(3)(A) of the Social Security Act and therefore not entitled to supplemental security income.

27   AR 31.

28      At step one, the ALJ found that Mr. Davis had not engaged in substantial gainful activity since

1    June 5, 2008, the alleged onset date.  AR 26.

2        At step two, he found that Mr. Davis had the severe impairments of status post rib fracture

3    secondary to a motor vehicle accident, cervical degenerative disc disease, and depression.  *Id.*  The

4    ALJ acknowledged that Mr. Davis had also been diagnosed with mild osteoarthritis of the hips and

5    mild degenerative disc disease of the lumbar spine, but concluded these were non-severe

6    impairments.  AR 27.  The ALJ further held that Mr. Davis's cocaine dependence in full remission

7    did not constitute a severe impairment.

8        At step three, the ALJ found that Mr. Davis did not have an impairment or combination of

9    impairments that meets or medically equals the severity of one of the listed impairments for

10   disorders of the spine (§ 1.04) or affective disorders (§ 12.04).  AR 27.  As for physical impairments,

11   Mr. Davis's diagnostic testing did not show evidence of nerve root compromise or listing-level

12   functional loss.  *Id.*  Finding that Mr. Davis's mental impairment caused mild restriction of activities

13   of daily living and in social functioning, and moderate restriction in concentration, persistence, or

14   pace, the ALJ concluded that his mental impairments did not meet paragraph B of the affective

15   disorders listing.  *Id.*

16       The ALJ then determined that Mr. Davis had the RFC to "perform a wide range to medium

17   work" but would be "limited to simple, routine, and repetitive tasks, involving only simple,

18   work-related decisions, with few, if any work place changes."  AR 27.

19       In making this finding, the ALJ first considered Mr. Davis's symptoms and how consistent they

20   were with the objective medical evidence.  AR 28.  The ALJ then determined whether there was an

21   underlying medically-determinable physical or mental impairment that reasonably could be expected

22   to produce Mr. Davis's pain and symptoms and then evaluated the intensity, persistence, and

23   limiting effects of the symptoms to determine the extent that they limited Mr. Davis's functioning.

24   *Id.*  To the extent that Mr. Davis's statements about the intensity or functionally limiting effects of

25   pain or other symptoms were not substantiated by objective medical evidence, the ALJ made

26   findings on the credibility of the statements "based on a consideration of the entire case record."  *Id.*

27       The ALJ summarized Mr. Davis's statements, including his claim that he continues to have pain

28   in his neck, hands, back, and legs due to a car accident in February 2009.  *Id.*  The ALJ

UNITED STATES DISTRICT COURT
For the Northern District of California

acknowledged Mr. Davis's testimony that his muscles twitch, sometimes uncontrollably; that his pain is a constant level 7 out of 10, with the worst pain in his back, neck, and shoulders; that his symptoms had improved after the accident, but returned after his fall in 2010; that he could lift 7 or 8 pounds; and that he can walk about a block before his right foot drops and causes him to trip.  *Id.*

The ALJ found that the objective medical evidence established a basis for Mr. Davis's allegations of symptoms but found his statements about the intensity, persistence, and limiting effects of these symptoms not credible to the extent they are inconsistent with his assessed RFC.  AR 27.

The ALJ gave little weight to the medical source statement of Mr. Davis's treating physician Dr. Smith, which opined that Mr. Davis could sit or stand for 5 minutes at a time, and could never lift, twist, stoop, crouch, or climb, and was likely to miss more than 4 days of work per month.  AR 28. The ALJ found that these "limitations are simply not supported by Mr. Davis's diagnostic testing or by the available clinical findings."  AR 28-29.

On the other hand, the ALJ gave great weight to the assessment of examining physician Dr. Bai in March 2010.  AR 29.  Dr. Bai observed Mr. Davis sit, stand, walk, change positions comfortably, and heel/toe walk with a normal gait.  *Id.*  He noted that Mr. Davis ambulated better without his cane.  *Id.*  Dr. Bai reported that Mr. Davis's negative straight leg raise test and an otherwise unremarkable examination of his upper extremities and spine.  *Id.*  The ALJ stated that Dr. Bai's assessment is supported by his clinical findings, Mr. Davis's x-ray reports, and his treatment records. *Id.*

The ALJ also gave great weight to the opinions of the consultative psychological examiner, but—viewing the evidence in the light most favorable to Mr. Davis—accepted Dr. Whelchel's more restrictive limitation.  *Id.*  The ALJ found that this limitation to simple, repetitive tasks was consistent with Mr. Davis's cognitive testing and his own reports that he is capable of performing a wide range of daily activities.  *Id.*  For example, Mr. Davis is "able to drive, take public transportation, manage his own funds, perform errands, cook, and tend to his personal needs."  *Id.* Mr. Davis also reported that "he enjoys playing video games with his nephews, and that he has an adequate relationship with his family and friends."  *Id.*

1    At step four, the ALJ gave Mr. Davis the benefit of the doubt and found that he is unable to

2    perform any past relevant work, which included work as a plumber, machine operator II, materials

3    handler, forklift operator, and truck driver (light).  AR 29.

4    At step five, the ALJ concluded that there are jobs that exist in the national economy that the

5    claimant could perform given his RFC, age, education, and work experience.  AR 30.  Although Mr.

6    Davis's limitations reduced the range of medium available, the VE testified that an individual of Mr.

7    Davis's age, education, work experience, and residual functional capacity could perform

8    representative occupations of hand packager and janitor.  *Id.*  Based on this testimony, the ALJ

9    concluded that Mr. Davis was "capable of making a successful adjustment to other work that exists

10   in significant numbers in the national economy."  AR 31.

11   The ALJ thus concluded the sequential process by stating that Mr. Davis "has not been under a

12   disability, as defined in the Social Security Act, from June 5, 2008, through the date of this

13   decision."  *Id.*

14                                          **ANALYSIS**

15   The Commissioner asks the court to affirm the denial of disability and disability insurance and

16   supplemental social security income.  Def.'s Mot., ECF No. 20 at 10.  Mr. Davis did not file a

17   motion for summary judgment, but in response to the court's order to show cause, wrote:

18       The Commissioner stated that I could lift 30-50 pounds when this is not true.  I have been seeing
         Dr. Merritt Smith and he stated and still say[s] that my injurie[s] are permanent, and that I am
19       totally disabled.  All these facts are stated in my case file.  I'm diagnosed with chronic arthritis
         and disc [disease] and extensive nerve damage.  How can they overlook this– pleas[e] hear me
20       out.

21   ECF No. 18 at 1.

22   Because Mr. Davis is pro se the court construes this response as his opposition and cross motion

23   for summary judgment.  *See Bretz v. Kelman*, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985) (en banc)

24   (recognizing that the court has "an obligation where the petitioner is pro se . . . to construe the

25   pleadings liberally and to afford the petitioner the benefit of any doubt.")

26   **I. LEGAL STANDARD**

27       **A. Standard of Review**

28   Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Commissioner if the plaintiff initiates the suit within 60 days of the decision.  District courts may set

2    aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or

3    are not supported by substantial evidence in the record as a whole."  42 U.S.C. § 405(g); *Vasquez v.*

4    *Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted).  "Substantial evidence means more

5    than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind

6    might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

7    Cir. 1995).  If the evidence in the administrative record supports both the ALJ's decision and a

8    different outcome, the court must defer to the ALJ's decision and may not substitute its own

9    decision.  *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

10   **B.  Applicable Law: Five Steps to Determine Disability**

11        An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical

12   or mental impairment which can be expected to result in death or which has lasted or can be

13   expected to last for a continuous period of not less than twelve months," and (2) the "impairment or

14   impairments are of such severity that he is not only unable to do his previous work but cannot,

15   considering his age, education, and work experience, engage in any other kind of substantial gainful

16   work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(A) & (B).

17        The Social Security regulations set out a five-step sequential process for determining whether a

18   claimant is disabled within the meaning of the Social Security Act.  *See* 20 C.F.R. § 404.1520.  The

19   five steps are as follows:

20   **Step One.**  Is the claimant presently working in a substantially gainful activity?  If so, then the
     claimant is "not disabled" and is not entitled to benefits.  If the claimant is not working in a
21   substantially gainful activity, then the claimant's case cannot be resolved at step one, and the
     evaluation proceeds to step two.  *See* 20 C.F.R. § 404.1520(a)(4)(I).
22

23   **Step Two.**  Is the claimant's impairment (or combination of impairments) severe?  If not, the
     claimant is not disabled.  If so, the evaluation proceeds to step three.  *See* 20 C.F.R.
     § 404.1520(a)(4)(ii).
24

25   **Step Three.**  Does the impairment "meet or equal" one of a list of specified impairments
     described in the regulations?  If so, the claimant is disabled and is entitled to benefits.  If the
26   claimant's impairment does not meet or equal one of the impairments listed in the regulations,
     then the case cannot be resolved at step three, and the evaluation proceeds to step four.  *See* 20
     C.F.R. § 404.1520(a)(4)(iii).
27

28   **Step Four.**  Considering the claimant's residual functional capacity, is the claimant able to do
     any work that he or she has done in the past?  If so, then the claimant is not disabled and is not

UNITED STATES DISTRICT COURT
For the Northern District of California

1    entitled to benefits.  If the claimant cannot do any work he or she did in the past, then the case
2    cannot be resolved at step four, and the case proceeds to the fifth and final step.  *See* 20 C.F.R.
     § 404.1520(a)(4)(iv).

3    **Step Five.**  Considering the claimant's residual functional capacity, age, education, and work
     experience, is the claimant able to "make an adjustment to other work?"  If not, then the claimant
4    is disabled and entitled to benefits.  *See* 20 C.F.R. § 404.1520(a)(4)(v).  If the claimant is able to
     do other work, the Commissioner must establish that there are a significant number of jobs in the
5    national economy that the claimant can do.  There are two ways for the Commissioner to show
     other jobs in significant numbers in the national economy: (1) by the testimony of a vocational
6    expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart
     P, app. 2.  If the Commissioner meets this burden, the claimant is not disabled.
7

8    For steps one through four, the burden of proof is on the claimant.  At step five, the burden shifts to

9    the Commissioner.  *See Tackett*, 180 F.3d at 1098.

10   **II. DISCUSSION**

11       **A. The ALJ Failed to Provide Specific and Legitimate Reasons for Rejecting the Opinion
            of Mr. Davis's Treating Physician.**
12

13       The court first examines whether the ALJ improperly discounted the medical opinion of

14   Dr. Smith.  The ALJ gave "little weight to the August 2010 medical source statement of the

15   claimant's treating physician, Dr. Smith," finding Dr. Smith's opinion as to Mr. Davis's limitations

16   on his RFC  "simply not supported by the claimant's diagnostic testing or by the available clinical

17   findings."  AR 28-29.  The Commissioner argues that the ALJ properly rejected Dr. Smith's opinion

18   given that he had seen Mr. Davis on a sporadic basis over a ten-month period and his clinical

19   examination findings were normal.  *See* Motion, ECF No. 20 at 10  (citing 29 C.F.R.  404.1527(c)

20   and 416.927(c)).  In addition, the Commissioner contends that the ALJ properly rejected Dr. Smith's

21   opinion because it was inconsistent with the other medical opinions regarding physical limitations.

22   *Id.*  The court disagrees.  The ALJ failed to fully develop the record even after acknowledging the

23   inadequacies of Mr. Davis's treating physician's notes and by relying on outdated opinions of non-

24   examining physicians to establish Mr. Davis's RFC.

25       When determining whether a claimant is disabled, the ALJ must consider each medical opinion

26   in the record together with the rest of the relevant evidence.  20 C.F.R. § 416.927(b); *Zamora v.*

27   *Astrue*, No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010).  "By rule, the Social

28   Security Administration favors the opinion of a treating physician over non-treating physicians."

1    *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527).   "The opinion of a

2    treating physician is given deference because 'he is employed to cure and has a greater opportunity

3    to know and observe the patient as an individual.'"   *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169

4    F.3d 595, 600 (9th Cir. 1999) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).

5    "However, the opinion of the treating physician is not necessarily conclusive as to either the

6    physical condition or the ultimate issue of disability."   *Id.* (citing *Magallanes v. Bowen*, 881 F.2d

7    747, 751 (9th Cir. 1989) and *Rodriguez v. Bowen*, 876 F.2d 759, 761-62 & n.7 (9th Cir. 1989)).   "If

8    a treating physician's opinion is 'well-supported by medically acceptable clinical and laboratory

9    diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record,

10   [it will be given] controlling weight.'"   *Orn*, 495 F.3d at 631(quoting 20 C.F.R. § 404.1527(d)(2)).

11   "If a treating physician's opinion is not given 'controlling weight' because it is not

12   'well-supported' or because it is inconsistent with other substantial evidence in the record, the

13   [Social Security] Administration considers specified factors in determining the weight it will be

14   given."   *Id.*   "Those factors include the '[l]ength of the treatment relationship and the frequency of

15   examination' by the treating physician; and the 'nature and extent of the treatment relationship'

16   between the patient and the treating physician."   *Id.* (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii)).

17   "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the

18   treating physician, include the amount of relevant evidence that supports the opinion and the quality

19   of the explanation provided; the consistency of the medical opinion with the record as a whole; the

20   specialty of the physician providing the opinion; and '[o]ther factors' such as the degree of

21   understanding a physician has of the [Social Security] Administration's 'disability programs and

22   their evidentiary requirements' and the degree of his or her familiarity with other information in the

23   case record."   *Id.* (citing 20 C.F.R. § 404.1527(d)(3)-(6)).   Nonetheless, even if the treating

24   physician's opinion is not entitled to controlling weight, it still is entitled to deference.   *See id.* at

25   632 (citing SSR 96-02p at 4 (Cum. Ed. 1996)).   Indeed, "[i]n many cases, a treating source's medical

26   opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test

27   for controlling weight."   SSR 96-02p at 4 (Cum. Ed. 1996).

28   "Generally, the opinions of examining physicians are afforded more weight than those of

18

non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians." *Orn*, 495 F.3d at 631 (citing 20 C.F.R. § 404.1527(d)(1)-(2)); *see also* 20 C.F.R. § 404.1527(d).  Accordingly, "[i]n conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJs weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527).  "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Id.* (quotation and citation omitted).  "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quotation omitted).[3]  Opinions of non-examining doctors alone cannot provide substantial evidence to justify rejecting either a treating or examining physician's opinion.  *See Morgan*, 169 F.3d at 602.  An ALJ may rely partially on the statements of non-examining doctors to the extent that independent evidence in the record supports those statements.  *Id.*  Moreover, the "weight afforded a non-examining physician's testimony depends 'on

---

[3] Although the type of reasons needed to reject either a treating or an examining physician's opinion is the same, the amount and quality of evidence in support of those reasons may be different. As the Ninth Circuit explained in *Lester*:

> Of course, the type of evidence and reasons that would justify rejection of an examining physician's opinion might not justify rejection of a treating physician's opinion.  While our cases apply the same legal standard in determining whether the Commissioner properly rejected the opinion of examining and treating doctors-neither may be rejected without 'specific and legitimate' reasons supported by substantial evidence in the record, and the uncontradicted opinion of either may only be rejected for 'clear and convincing' reasons-we have also recognized that the opinions of treating physicians are entitled to greater deference than those of examining physicians. *Andrews*, 53 F.3d at 1040-41; *see also* 20 C.F.R. § 404.1527(d).  Thus, reasons that may be sufficient to justify the rejection of an examining physician's opinion would not necessarily be sufficient to reject a treating physician's opinion.  Moreover, medical evidence that would warrant rejection of an examining physician's opinion might not be substantial enough to justify rejection of a treating physician's opinion.

*Lester v. Chater*, 81 F.3d 821, 831 n.8 (9th Cir. 1995).

1    the degree to which they provide supporting explanations for their opinions.'" *See Ryan*, 528 F.3d at

2    1201 (quoting 20 C.F.R. § 404.1527(d)(3)).

3          **1.     The ALJ Had a Duty to Resolve the Ambiguity Apparent in the Record**

4          The ALJ repeatedly stated during the hearing that he was unable to read Dr. Smith's treatment

5    notes:

6          I think I saw from Dr. Smith's records - -  I don't know who taught Dr. Smith to write.  He
           probably needs to go back to penmanship school.  It is pretty difficult to read. . . .
7          AR 55.

8          [A]s I said, it's difficult for me to see what objective findings he's relying on. . . . .  AR 80.

9          [T]he nurse's note, whoever put down the - - either that or his handwriting gets worse and worse
           the more he writes . . . I can't read the next line to save my life.  No drug allergies . . . I have a
10         really hard time reading his diagnosis . . . AR 82.

11         "The ALJ in a social security case has an independent duty to fully and fairly develop the record

12   and to assure that the claimant's interests are considered." *Tonapetyan v. Halter*, 242 F.3d 1144,

13   1150 (9th Cir. 2001) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)) (internal

14   quotation marks omitted).  This duty applies even where the claimant is represented and is triggered

15   where the evidence is ambiguous, or where the ALJ finds that the record is inadequate to allow for

16   proper evaluation of the evidence. *Hadera v. Colvin*, C-12-5315 EMC, 2013 WL 4510662, at *4

17   (N.D. Cal. Aug. 22, 2013) (citing *Tonapetyan*, 242 F.3d at 1150.).  "An ALJ is required to recontact

18   a doctor only if the doctor's report is ambiguous or insufficient for the ALJ to make a disability

19   determination." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).  "A specific finding of

20   ambiguity or inadequacy of the record is not necessary to trigger this duty to inquire, where the

21   record establishes ambiguity or inadequacy." *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011);

22   see *Williams v. Astrue*, ED CV 08-549-PLA, 2010 WL 431432 (C.D. Cal. Feb. 1, 2010) (holding

23   that "ALJ's finding that [doctor's] treatment notes were unclear or illegible . . . should have

24   triggered his duty to clarify those ambiguities. . . .  When medical records are inadequate to

25   determine whether a claimant is disabled, the ALJ must recontact the medical source, including the

26   treating physician if necessary, to clarify the ambiguity or to obtain additional information pertaining

27   to the claimant's medical condition.) (citing 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1)).

28         On remand, the ALJ should recontact Dr. Smith to resolve any perceived inadequacies and fully

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

C 13-03082 LB
ORDER

20

UNITED STATES DISTRICT COURT
For the Northern District of California

1   develop the record.  *See* 20 C.F.R. §§ 404.1519a(b)(4), 416.919a(b)(4) (where the medical evidence

2   contains "[a] conflict, inconsistency, ambiguity, or insufficiency," the ALJ should resolve the

3   inconsistency by recontacting the medical source); *see also Smith v. Astrue*, EDCV08-1131PLA,

4   2009 WL 1653032 (C.D. Cal. June 10, 2009) (holding that the ALJ's finding that the treating

5   physician's report was illegible, along with the ALJ's conclusion that the physician's opinion was

6   unsupported by objective medical findings, should have triggered the ALJ's duty to seek further

7   development of the record to determine the basis of his findings) (citing *Tonapetyan,* 242 F.3d at

8   1150).

9           *2.      The ALJ Relied on Outdated Medical Evidence to Determine Dr. Smith's RFC*

10      The ALJ acknowleged the deterioration of Mr. Davis's condition during the hearing:

11      It seems like his impairments have been worsened since this fall in April of 2010, which was the
        first time I really had kind of significant imaging studies.  There had been some mild
12      degenerative changes noted prior to that, but - - and of course the fractures and stuff related to
        the accident.  But, I mean, April of 2010 was the first time I saw kind of significant cervical
13      problems, which, as I said, Dr. Smith's notes are so terribly difficult to read, it's difficult for me
        to see what objective findings he's relying on.  I can see those X-days and say, okay, at least
14      those cervical X-rays seem to give some basis for the rather stringent limitations that Dr. Smith
        would suggest that I adopt . . .

15

16   AR 80-81.  When discussing the significance of the alleged onset date, the ALJ further stated

17      If I give Dr. Smith's opinion great weight, he started seeing the claimant in September of 2009.
        The ortho [consulting examiner] had a fairly normal exam in March of 2010.  Of course then he
18      had this fall in . . . April of 2010.  So I guess I'm having difficultly getting back further than that
        . . . than that fall based on kind of the mild x-rays in September of '09, the ortho exam, where,
19      you know, negative SLR, full range of motion in the back, mild tenderness in the knee and
        lower back, some minimal tenderness in the left shoulder, five of five strength throughout.

20

21   AR 83.  Mr. Davis's attorney then noted, "Yeah, chronologically I guess that was about a month

22   before he fell down the stairs."  *Id.*

23      Despite these statements, the ALJ relied on the examinations of Dr. Bai and Dr. Bianchi, which

24   were both conducted in March 2010 — one month before Mr. Davis's fall.  The Ninth Circuit has

25   held that where a claimants condition is progressively deteriorating, "the most recent medical report

26   is the most probative."  *Stone v. Heckler*, 761 F.2d 530, 532 (9th Cir. 1985).  Under similar facts, the

27   Court found that medical evaluations based on the claimant's condition several months before did

28   not constitute substantial evidence to rebut the conclusions contained in his treating physician's final

report.  *Id.*  The determinations of two consultative, non-examining Social Security advisors—which did not even consider either of the treating physician's last two reports—were entitled to even less weight.  *Id.*; *see also Osenbrock v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001) (finding that medical evaluations prepared months earlier were not substantial evidence sufficient to rebut more recent conclusions by a treating physician) (citing *Stone*, 761 F.2d at 532).

Moreover, in order to give less than controlling weight to the opinion of a treating physician, an ALJ must address the factors discussed in *Orn v. Astrue*, 495 F.3d at 631 (listing "the length of the treatment relationship, the frequency of examination by the treating physician; and the nature and extent of the treatment relationship between the patient and the treating physician" as factors).  The ALJ failed to address these factors.  Indeed, his decision did not even acknowledge Mr. Davis's six visits to Dr. Smith after Dr. Bai's examination and Dr. Bianchi's RFC assessment.

In sum, the ALJ erred by not giving any specific and legitimate reasons supported by substantial evidence in the record for rejecting Dr. Smith's opinion on Mr. Davis's limitations and by failing to fully develop the record.  Accordingly, remand is warranted.

## CONCLUSION

For the foregoing reasons, the court **DENIES** the Commissioner's motion for summary judgment.  The court **REMANDS** this case to the Commissioner for further proceedings consistent with this order.

This disposes of ECF No. 20.

**IT IS SO ORDERED.**

Dated: September 30, 2014

_____
LAUREL BEELER
United States Magistrate Judge